**Robert McGARRY and Nancy McGarry, Plaintiffs,**

v.

**RESOLUTION TRUST CORPORATION as Receiver for Polifly Savings & Loan Association, Defendant.**

**Civ. No. 93–578 (WHW).**

United States District Court, D. New Jersey.

Dec. 5, 1995.

Bruce L. Atkins and Andrew T. Fede, Contant, Scherby & Atkins, Hackensack, NJ, for Plaintiffs, Robert and Nancy McGarry.

Helen A. Nau, Brach, Eichler, Rosenberg, Silver, Bernstien, Hammer & Gladstone, A Professional Corporation, Roseland, NJ, for Defendant, Resolution Trust Corporation.

### AMENDED OPINION

WALLS, District Judge.

This matter comes before the Court on defendant Resolution Trust Corporation's ("RTC") motion under Local Rule 12(i) for reargument with respect to an order entered June 22, 1995 denying its motion for summary judgment.

Defendant had moved for summary judgment on the following grounds: (1) the uncontested facts; (2) 12 U.S.C. 1823(e) of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"); (3) no contract to extend the lease was formed as there was no "meeting of the minds"; (4) the statute of frauds; (5) the doctrines of estoppel and laches; and (6) the plaintiff's claim for damages was unsupported by the facts. Summary judgment was denied because material issues of fact were found as to the existence of a contract and the issue of damages. Defendant asserts that this ruling should be reconsidered because the Court "overlooked" the statutory (§ 1823) claim which provides an independent basis for summary judgment even if a binding leasehold agreement exists.

### STATEMENT OF FACTS

In March 1988, plaintiffs McGarry and Polifly Savings & Loan Association ("Polifly") entered into a two-year lease agreement. The rider to the lease agreement contains a renewal option for an additional three year lease term:

> Tenant shall have an option to renew the Lease ("Renewal Option") for an additional three (3) year period ("Renewal Period") upon the same terms and conditions as contained in the within Lease with the exception of rental ... In the event that

Tenant exercises the Renewal Option during the second year of the Lease, rental for the Renewal Period will be negotiated by the Landlord and Tenant. Tenant may exercise the Renewal Option by giving written notice to the Landlord ... three (3) months prior to the end of the second year of the Lease.

See Certification of Helen Nau, Exh. 1, paragraph 2.

On December 20, 1989 during the second year of the original two-year term, Polifly gave written notice to plaintiffs:

Please be advised that in accordance with the terms and conditions set forth in the lease agreement ..., we are hereby notifying you that we desire to exercise the renewal option contained in the aforementioned lease.

See Certification of Sandy Coulthart, Exh. A.

Thereafter the McGarrys and Polifly negotiated the rental amount by letter. On March 20, 1990, plaintiffs offered monthly payments of $2,4000.00, $2,700.00 and $3,000.00 for the first, second and third years respectively. *Id.* at Exh. B. Polifly, on May 4, 1990, responded with a counteroffer of $2,200.00, $2,500.00 and $2,800.00 for the first, second and third years respectively. *Id.* at Exh. C.

Plaintiffs set forth a rent schedule for a ten-year lease in a May 18, 1990 letter which related that said schedule was "[p]er [Polifly's] conversation with [plaintiff's] staff. *Id.* at Exh. D. The letter also cautioned:

All proposals regarding a long term lease are subject to approval of my attorney Bruce Atkins.

Your June rent shall be $2,984.00. If you should choose to remain leasing the property, please adhere to the above mentioned schedule. Also, the above is conditional upon entering into a formal lease.

*Id.* Polifly did not respond to the May 18, 1990 letter in writing. However it did pay plaintiffs' monthly rental amounts outlined in the May 18, 1990 letter. See Affidavit of Robert McGarry, Exh. A.

On July 22, 1991, Polifly wrote a letter to the plaintiffs asserting that it considered itself a month-to-month tenant and that it would vacate the premises on or about November 30, 1991. See Certification of Sandy Coulthart, Exh. E. Polifly later vacated the premises.

In January 1992, plaintiffs filed their Complaint alleging wrongful termination of the lease agreement and that Polifly had caused substantial damage to the leased premises.

### *PROCEDURAL HISTORY*

As above, on January 30, 1992, plaintiffs, Robert and Nancy McGarry filed, a Complaint in the Superior Court of New Jersey, Bergen County, against defendant Polifly Savings & Loan Association.

On November 19, 1992, the Office of Thrift Supervision, Department of Treasury, declared Polifly Savings & Loan insolvent, ordered it closed, and appointed the Resolution Trust Corporation ("RTC") as receiver.

On February 9, 1993, defendant filed a Notice substituting the RTC in its capacity as receiver for Polifly Savings & Loan Association and a Notice of Removal pursuant to the Resolution Trust Corporation, Refinancing, Restructuring and Improvement Act of 1991, 12 U.S.C. § 1441a,[1] removing this action to the United States District Court of New Jersey. On February 19, 1993, the District Court entered an Order staying the action for ninety days.

In the interim, plaintiffs pursued an administrative claim through the RTC Administrative Claim Procedure. On November 1, 1994, that claim was denied, in part, because plaintiffs produced no document executed by Polifly signifying its agreement to a specified rental amount.

On March 16, 1995, defendant moved for summary judgment before this Court. On June 22, 1995, the motion was denied.

---

1. Under Section 1441a(*l*)(1), "any civil action, suit, or proceeding to which the Corporation is a party shall be deemed to arise under the laws of the United States, and the United States district courts shall have original jurisdiction over such action, suit or proceeding." 12 U.S.C. § 1441a(*l*)(1).

## DISCUSSION

### I. Defendant's 12(I) Motion for Reargument

■ Local Rule 12(I) permits counsel to seek reconsideration by the Court of matters "which counsel believes the Court has overlooked" when it ruled on a motion. Requests pursuant to this rule are to be granted "sparingly," *Maldonado v. Lucca*, 636 F.Supp. 621, 630 (D.N.J.1986), and only when "dispositive factual matters or controlling decisions of law" were brought to the court's attention but not considered. *Pelham v. United States*, 661 F.Supp. 1063, 1065 (D.N.J.1987).

■ The case at bar presents one of the rare situations in which a motion for reargument should be granted. The Court did indeed overlook defendant's argument concerning the potentially dispositive nature of the *D'Oench Duhme* doctrine and its statutory counterparts. The June 22, 1995 order denying defendant's motion for summary judgment was premised on the presence of the material fact issue of whether a valid lease had been formed by the parties. However, as will be discussed below, even if it is assumed that a binding contract was created, the failure of the contract to satisfy *D'Oench Duhme* would require that a summary judgment be granted to the defendant. 12 U.S.C. § 1823(e); 12 U.S.C. § 1821(d)(9)(A); *see also Fox and Lazo–Atlantic v. Resolution Trust Corp.*, 862 F.Supp. 1233, 1237 (D.N.J. 1994), (describing whether an agreement fell within *D'Oench Duhme* "as a threshold issue").

Thus defendant's motion for reargument pursuant to Local Rule 12(I) is granted: the Court will reconsider defendant's motion for summary judgment on the grounds that plaintiffs are precluded from recovering as a matter of law because of the failure of the alleged lease agreement to satisfy *D'Oench Duhme*.

### II. Defendant's Motion for Summary Judgment on the Failure of the Lease Agreement to Satisfy *D'Oench Duhme*

#### A. Standard for Summary Judgment

■ Summary judgment may be granted only if the pleadings, supporting papers, affidavits, and admissions on file, when viewed in a light most favorable to the nonmoving party, present no issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see Todaro v. Bowman*, 872 F.2d 43, 46 (3d Cir.1989). Alternately, "summary judgment may be granted if the movant shows that there exists no genuine issues of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Indiana Hospital*, 843 F.2d 139, 143 (3d Cir.), *cert. denied*, 488 U.S. 870, 109 S.Ct. 178, 102 L.Ed.2d 147 (1988). A "genuine" issue exists if a reasonable jury could possibly find in favor of the non-moving party on that issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). Moreover, a fact is considered "material" when it affects the outcome under the applicable law. *Id.* at 248, 106 S.Ct. at 2510.

#### B. D'Oench Duhme Doctrine and 12 U.S.C. § 1823(e)

In *D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp.*, the Supreme Court formulated a federal common law doctrine protecting bank insurers from being subject to secret agreements between a borrower and a bank. 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942); *Beener v. La Sala*, 813 F.Supp. 303, 306 (D.N.J.1993). The defendant in *D'Oench*, with the agreement of the bank, executed a series of promissory notes payable to the bank with the understanding that the notes would never be called. However, after the bank failed, the FDIC stepped in and sought to enforce the notes. The defendant claimed that the undisclosed agreement he had made with the bank precluded the FDIC from recovering.

■ The Court found that a federal policy existed which protected bank insurers, such as the FDIC, from misrepresentations about the assets of a bank. 315 U.S. at 457, 62 S.Ct. at 679; 813 F.Supp. at 306. The defendant was therefore estopped from asserting that the surreptitious agreement with the bank barred recovery by the FDIC. 315 U.S. at 460–61, 62 S.Ct. at 680–81:

The test is whether the note was designed to deceive the creditors or the public authority, or would tend to have that effect. It would be sufficient in this type of case that the maker lent himself to a scheme or arrangement whereby the banking authority on which respondent relied in insuring the bank was or was likely to be misled. *Id.* at 460, 62 S.Ct. at 681. For the doctrine to apply it is not necessary that a showing be made that the debtor had the intent to defraud the simple existence of an agreement likely to mislead an insurer is sufficient. *See Timberland Design, Inc. v. First Service Bank for Savings,* 932 F.2d 46, 48 (1st Cir. 1991).

More recently, the Supreme Court in *Langley v. Federal Deposit Ins. Corp.,* explained that the purpose of the *D'Oench Duhme* doctrine is to "allow federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets ... Neither the FDIC nor state banking authorities would be able to make reliable evaluations if bank records contained seemingly unqualified notes that are in fact subject to undisclosed conditions." 484 U.S. 86, 91–92, 108 S.Ct. 396, 401, 98 L.Ed.2d 340 (1987). "The rule emerging from *D'Oench Duhme* is that no agreement between a borrower and a bank which does not plainly appear on the face of an obligation or in the bank's official records is enforceable against the FDIC." *Adams v. Madison Realty & Development, Inc.,* 937 F.2d 845 (3d Cir. 1991). In addition, this doctrine has been held to apply to the Resolution Trust Corporation. *Id.* at 852; 12 U.S.C. § 1441a(b)(4) (conferring upon the RTC the same "powers and rights to carry out is duties" given to the FDIC under 12 U.S.C. § 1823).

■ The *D'Oench Duhme* doctrine was essentially codified in the Federal Deposit Insurance Act of 1950, § 2[13](e), as amended, 12 U.S.C. § 1823(e) (1989), which provides that:

No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—

(1) is in writing,

(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(4) has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C. § 1823(e). While *D'Oench Duhme* and Section 1823(e) often apply to the same transaction, differences between the two exist. The former is a rule of equitable estoppel and "applies to any defense that a borrower may assert where the borrower participated in a *scheme* tending to deceive bank examiners." *Beener,* 813 F.Supp. at 307 (emphasis added). § 1823(e) is broader because it applies to all "agreements" between the borrower and the bank, whether or not they are secret. *Id.*

Defendant RTC argues that *D'Oench Duhme* or § 1823(e) applies to any lease agreement between the plaintiffs and Polifly and because this agreement fails to satisfy the doctrinal and statutory requirements, summary judgment must be granted. Plaintiffs counter that the lease agreement is without these restrictions because *D'Oench Duhme* was intended to apply only to traditional banking activity; here this dispute involves a bank which has broken a property lease.

In the previous summary judgment motion brought by defendant, this Court concluded that whether an actual lease agreement was created was an issue of fact to be resolved at trial. For purposes of this motion, it is assumed that an enforceable lease agreement exists. Hence, the issues before the Court are: does the lease agreement fall within *D'Oench Duhme* or its statutory counterparts, and if so, does it meet those requirements?

The exact scope of *D'Oench Duhme* and § 1823(e) has not been decided by the Supreme Court or the Third Circuit. However, a number of Circuits have addressed the issue. The Fifth Circuit, in *Thigpen v. Sparks*, 983 F.2d 644 (5th Cir.1993), considered it in the context of a breach of warranty action. Sparks purchased a Texas trust company from BancTexas, Dallas, which made several representations to Sparks. BancTexas was declared insolvent later and the FDIC was appointed its receiver. Sparks sued the FDIC which then sought summary judgment on the basis of § 1823(e). The Court determined that § 1823(e) "does not apply to a claim arising from a bank's sale of an asset in a nonbanking transaction." *Id.* at 646–47. By its terms, the statute applies only to agreements "which tend[ ] to diminish or defeat the interest of [the FDIC] in any asset" 12 U.S.C. § 1823(e). Because Sparks' claim arose from an asset *sold* by BancTexas before the FDIC was appointed receiver, the agreement in question could not diminish any asset acquired by the FDIC. *Id.* at 647. In addition, § 1823(e)(2), "which requires that, to be enforced, such an 'agreement' must have been executed 'contemporaneously with the *acquisition of the asset*' by the bank does not comfortably, to say the least, fit the *sale* of an *asset.*" *Id.* (emphasis in original). More recently, in *Alexandria Assoc., Ltd. v. Mitchell Co.*, 2 F.3d 598, 603 (5th Cir.1993), that same Court had occasion to explain its *Thigpen* decision:

> The purposes of neither the recordation nor approval requirements of *D'Oench* would be furthered by including non-banking transactions within the aegis of the doctrine. The substantial volume of information regarding areas of commerce outside the bank examiner's expertise or cognizance, generated day by day in myriad non-banking transactions, would simply overwhelm the bank's officers and directors.

In reversing the District Court's grant of a motion for summary judgment, the Fourth Circuit, in *E.J. Sebastian Assoc. v. Resolution Trust Corp.*, 43 F.3d 106 (4th Cir.1994) adopted the reasoning of the Fifth Circuit.

The Court found that summary judgment was inappropriate because whether *D'Oench Duhme* applied to a contract between a bank and a third party to help the bank raise capital had not been addressed by the District Court; the Circuit Court strongly suggested that *D'Oench Duhme* would not apply because the plaintiff's claim "involves a contract for services, not the lending of money." *Id.* at 109. The Court questioned whether "everyone furnishing supplies or services to a bank [need] comply with the stringent requirements of § 1823(e) in order to be guaranteed payment in the event that the bank fails before he receives compensation for his services" *Id.* at 109.

The Ninth Circuit has also favored a less expansive reading of § 1823(e). In *Murphy v. Federal Deposit Ins. Corp.*, 38 F.3d 1490 (9th Cir.1994), it held that letters of credit were not an "agreement which tends to diminish or defeat the interest of the Corporation *in any asset*" within the statute because they were not assets; rather, they are liabilities. *Id.* at 1500 (emphasis in original).[2]

The Eighth Circuit, however, has interpreted § 1823(e) to the contrary. *North Arkansas Medical Center v. Barrett*, 962 F.2d 780 (8th Cir.1992), treated whether the claim of a creditor to a bank, in which the FDIC has been appointed receiver, holding a security interest would be barred from collecting because of the statute. The Court rejected the idea that the statute was only designed to apply to "borrower[s], debtor[s] or other obligor[s]" of the failed bank. *Id.* at 787. It therefore held that § 1823(e) applied to creditors as well as borrowers because the "plain language" drew no distinction between the two. *Id.* In dicta, however, this Circuit Court seemed to go further by stating that "[t]he goal of enabling regulators to make accurate assessments of a bank's net worth would be undercut by exempting claims from section § 1823(e) simply because they did not pertain to the bank's lending function." Under this reasoning, *any* agreement, including the one here, would be subject to the statute.

---

**2.** The Court declined to decide whether the common law *D'Oench Duhme* doctrine applied when the party that the FDIC seeks to estop is a

creditor rather than a debtor. *Murphy*, 38 F.3d at 1500.

This Court finds that the interpretation of § 1823(e) made by the Fifth, Fourth and Ninth Circuits to be most persuasive and to accord with the tenor of Third Circuit decisions most closely on point. Considering the respective judicial and legislative purposes of *D'Oench Duhme* and § 1823, it is unlikely that either proscription was meant to apply to the lease in this dispute.

■ The common law *D'Oench Duhme* doctrine is inapplicable to the plaintiff's claim that the RTC as receiver for Polifly is liable for the breach of an ordinary leasehold. As the Third Circuit stated in *Adams*, 937 F.2d 845, this doctrine equitably estops a *borrower* from asserting a particular *affirmative defense*. Because the RTC, not in borrower status, seeks to use this doctrine to bar a *plaintiff's* claim, this case falls without the purview of the doctrine.

■ As for § 1823(e), that too does not apply. The Circuits which have dealt with the issue of the scope of this statue have drawn distinctions between banking and non-banking transactions, acquisitions versus sales of assets, and whether the party with whom the now insolvent bank contracted was a debtor or creditor. This Court is persuaded that the most salient distinction concerns whether the agreement at issue involves to those activities peculiar to banking or to activities associated with running a business generally. Here the dispute involves no less and certainly no more than an ordinary lease or rental of office space. Merely because the defendant herein happens to be the receiver of an insolvent bank is not sufficient to trigger the statute; if it were, than every contract entered into between a bank and a third party would have to be approved by the board of directors of the bank. If the defendant's interpretation of the statute were correct, an individual who contracted with a now insolvent bank in receivership to provide janitorial services would not be able to collect from the RTC for past services unless the contract at issue had been approved by the

bank's board of directors. § 1823(e) could not have been drafted to produce this result.

Finally, defendant relies on *Hawke Assoc. v. City Federal Savings Bank*, 787 F.Supp. 423 (D.N.J.1991), to bolster its interpretation of § 1823(e). *Hawke* similarly concerned the question of whether the claim of a landlord, of a bank whose assets were now held by the RTC, that the bank had breached its lease would be dismissed because the lease failed to meet the requirements of § 1823(e). While the District Court did grant the RTC's motion for summary judgment, it did so because the "plaintiffs have not provided more than a 'mere scintilla of evidence' in support of their contention that agreements exist ... which satisfy the requirements of 12 U.S.C. § 1823." *Id.* at 428. There it was not necessary for that Court to consider the scope of the statute because the Court had determined that no enforceable agreement had been created. In contrast, this Court, for purposes of this motion, has assumed that a lease agreement does exist. Unlike *Hawke*, this Court must determine the scope of § 1823(e), and finds it inapplicable to non-banking transactions such as the instant leasehold.

### C. 12 U.S.C. § 1821(d)(9)(A)

■ Even if § 1823(e) does not apply to the lease at bar, defendant argues that § 1821(d)(9)(A) independently renders § 1823(e) applicable:

[A]ny agreement which does not meet the requirements set forth in [12 U.S.C. § 1823(e)] shall not form the basis of, or substantially comprise, a claim against the receiver or the Corporation.

12 U.S.C. § 1821(d)(9)(A). A number of statutory interpretation issues are raised by this provision,[3] but the most important concern the scope of § 1821(d)(9)(A) and the extent to which it modifies, if at all, § 1823(e). Again, while there is no binding precedent, other Circuits have directly addressed these questions.[4]

---

**3.** Another issue that this Court will not address concerns the meaning of the word "claim" in § 1821(d)(9)(A). *See Thigpen*, 983 F.2d at 648 ("We have parsed the remainder of FIRREA un-

successfully trying to find a consistent definition of 'claim' ").

**4.** The interpretative problems at hand are compounded by the "obscure and ambiguous" legis-

Defendant claims that a plain language reading of § 1821 mandates that summary judgment be granted in its favor. The statute says "*any* agreement" which constitutes part or all of a claim against the FDIC (or RTC) must meet the § 1823(e) requirements. Thus, because the lease at issue falls within "any agreement," and because the lease was not approved by Polifly's Board, plaintiffs' claim must be dismissed. The Eighth Circuit provides the defendant with some precedent, for in *North Arkansas Medical Center*, 962 F.2d at 789, the Court mechanically applied the § 1823(e) requirements, through § 1821(d)(9)(A), to a security agreement, holding that this reading was "textually compelled."

A strong case in support of defendant's position is *Fox & Lazo–Atlantic v. Resolution Trust Corp.*, 862 F.Supp. 1233 (D.N.J. 1994), which held that § 1821(d)(9)(A) barred a plaintiff's claim for payment of a real estate brokerage commission upon the now insolvent bank's sale of real property. There the Court read § 1821(d)(9)(A) to apply the four requirements of § 1823(e) to *any* agreement against the RTC, whether or not it constituted an "agreement which tends to diminish or defeat the interest of the [RTC] in any asset acquired by it," as the paragraph preceding and modifying those four procedural requirements states. *Id.* at 1242.

This Court acknowledges that the interpretation of § 1821(d)(9)(A) is far from settled. Yet, consistent with the interpretation of the statute by a majority of Circuits which have addressed this issue, this Court finds that the § 1823(e) requirements are not applicable to the lease at bar through § 1821(d)(9)(A). The statutory dilemma is whether the latter was meant to expand upon the types of agreements that are covered by the former. The Court has already decided that § 1823(e) applies only to banking transactions, which does not include the agreement herein. This interpretation was derived from the history of *D'Oench Duhme*, as well as from the text of the short paragraph in § 1823(e) modifying the four requirements enumerated in that provision.[5] According to the defendant's "plain" reading of § 1821(d)(9)(A), that modifying paragraph is to be read out of the statute; any claim involving the RTC, therefore, would have to meet the four requirements listed in § 1823(e), but *not* the modifying paragraph which precedes it. To the Court, however, such a "plain" reading is not obvious. Indeed, the Fifth Circuit in *Thigpen* stated:

> While [the Supreme Court in] *Langley* broadly defines an "agreement" made under § 1823(e), it does *not* say that any "agreement" must be unhinged from the rest of the statutory language which contemplates that the "agreement" bear upon an "asset" "acquired" by the institution and later by the FDIC. The question is not whether *Langley*'s definition of an "agreement" applies to § 1821(d)(9)(A)— we assume it does—but instead whether the modifiers expressly used in § 1823(e), referencing an agreement in connection with an "asset" "acquired" by the institution, are also expressed in § 1821(d)(9)(A). To state the question that way is to answer it. Those modifiers are clearly expressed ... [They] bind § 1823(e) to its origins in the *D'Oench* doctrine as a device to protect the federal regulators from side agreements that would have impeded the collection of obligations owed to the Bank. Such obligations are the bank's "asset" acquired in the course of its banking activities.

983 F.2d at 648–49 (emphasis in original); see also *Murphy*, 38 F.3d 1490 (9th Cir. 1994); *E.J. Sebastian Assoc.*, 43 F.3d 106 (4th Cir.1994).[6] Thus, for the same reasons that the lease agreement in the instant action does not fall within § 1823(e) directly, it does

---

lative history. *Thigpen*, 983 F.2d at 648.

5. The paragraph, which is followed by the four requirements, provides:
   No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title ... shall be valid against the Corporation unless such agreement ...

12 U.S.C. § 1823e.

6. Furthermore, the legislative history, to the extent it is at all conclusive, "suggests that § 1821(d)(9)(A) was not intended to plow new substantive ground by enhancing FDIC's avoiding powers." *Thigpen*, 983 F.2d at 648 (citing FIRREA House Rep., 1986 U.S.C.C.A.N. at 128).

not fall within it through § 1821(d)(9)(A) the lease does not concern traditional banking activity, nor does it pertain to an asset acquired by Polifly (or the RTC).

Because the lease does not fall within *D'Oench Duhme* or its statutory counterparts, defendant's motion for summary judgment is denied.

### CONCLUSION

For the reasons stated it is on this 5th day of December, 1995;

ORDERED that defendant's motion for reargument is **granted;** and further ORDERED that defendant's motion for summary judgment is **denied.**

**SO ORDERED.**